**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Civil Action No.: 1:25-cv-00096-CCE-JLW**

| | |
|---|---|
| MICHAEL WAMBOLD and ROBERT GUPTILL, On Behalf of Themselves and All Others Similarly Situated,<br><br>*Plaintiffs*,<br>v.<br><br>RTA MEDIA HOLDINGS, LLC D/B/A RACING AMERICA,<br><br>*Defendant*. | **DEFENDANT RTA MEDIA HOLDINGS, LLC'S OPENING BRIEF IN SUPPORT OF MOTION TO DISMISS CLASS ACTION ALLEGATIONS PURSUANT TO FRCP 12(b)(6), 12(f) AND/OR 23(c)(1)(A)**<br><br>**ORAL ARGUMENT REQUESTED PURSUANT TO L.R. 7.3(c)(1)** |

Defendant RTA Media Holdings, LLC d/b/a Racing America ("RTA Media") hereby moves to dismiss the class action allegations asserted in Plaintiffs Michael Wambold ("Wambold") and Robert Guptill's ("Guptill" and collectively referred to herein with Wambold as the "Plaintiffs") Class Action Complaint (the "Complaint," ECF No.1) pursuant to Rules 12(b)(6) ("Rule 12(b)(6)"), 12(f) ("Rule 12(f)") and/or 23(c)(1)(A) ("Rule 23(c)(1)(A)") of the Federal Rules of Civil Procedure (the "Motion").

RTA Media's Motion is made and based on the allegations asserted in the Compliant, the Declaration of Colin Smith submitted in support of the Motion (the "Smith Decl."), the pleadings on file in this matter, and any argument of counsel entertained by the Court.

## I. NATURE OF THE MATTER

Plaintiffs have commenced this action seeking class action certification based on RTA Media's alleged unauthorized dissemination of certain personally identifiable

315552142v.2

information ("PII") without their consent in connection with their agreement to subscribe to the company's video content platform located at www.racingamerica.tv (the "Website"). (*See, e.g.,* ECF No. 1 at 1). At first blush, Plaintiffs' allegations appear genuine and meritorious – until they are subject to factual scrutiny placed at issue by their own allegations. When such scrutiny is even superficially employed, it becomes readily apparent that Plaintiffs cannot viably assert or maintain their class action alleations in this action because they have expressly waived such rights when agreeing to RTA Media's Viewer Terms of Service Agreement (the "Terms of Service Agreement" or "Terms of Service") upon subscribing to the company's website. (Smith Decl. ¶¶ 9, 11-13.)

Thus, the Court's adjudication of RTA Media's Motion is straightforward. First, the United States Court of Appeals for the Fourth Circuit has recently affirmed the enforceability of class action wavier provisions such as that relied upon in RTA Media's Motion. *See Maldini v. Marriott Int'l, Inc.,* 2025 U.S. App. LEXIS 13492, at *14 (4th Cir. June 5, 2025) ("*Marriott II"*). RTA Media's Terms of Service Agreement, which the Plaintiffs agreed to upon subscribing to the Website and have consented to all amendments thereto by maintaining their subscriptions, clearly contains a class action waiver provision, which precludes their ability to seek class action certification or relief in this action. (Smith Decl. ¶¶ 9, 11-13.) Accordingly, whether a determination is reached by the Court under Rule 12(b)(6), Rule 12(f) and/or Rule 23(c)(1)(A), the result is the same – Plaintiffs' class action allegations and request for class certification cannot proceed and must be dismissed and/or stricken.

## II. STATEMENT OF FACTS

### A. Overview of Plaintiffs' Allegations.

Plaintiffs' Complaint seeks class action certification on behalf of all persons who subscribed to RTA Media's Website, which is dedicated to offering streaming and pay-per-view racing and NASCAR Cup Team content and other related original, exclusive content. (ECF No. 1 ¶¶ 1-4.) Plaintiffs allege that RTA Media's Website employs certain data tracking technology by deploying certain pixels, such as the Meta/Facebook pixel and Google Ads pixel, used to collect information concerning subscriber's video content viewing history and other "sensitive information" also known as personally identifiable information ("PII"). (*Id.* ¶¶ 103-132.) These pixels are alleged to then transmit the subscriber's purported sensitive information to third-party providers without the subscriber's consent or authorization. (*Id.*) Plaintiffs allege that this conduct constitutes violations of: (1) the Video Privacy Protection Act (the "VPPA"); (2) the Federal Wiretap Act; (3) the Pennsylvania Wiretapping and Electronic Surveillance Control Act ("WESCA"); and (4) Intrusion Upon Seclusion. (*Id.* ¶¶ 213-268.)

Plaintiffs seek class certification as to a "Nationwide Class," composed of all persons in the United States that subscribed to the Website and had their PII disclosed to third parties without their consent, and a "Pennsylvania Subclass," composed of all persons in Pennsylvania that subscribed to the Website and had their PII disclosed without their consent." (ECF No. 1 ¶¶ 199-201.) Plaintiffs and the Nationwide Class seeks recovery on the following claims for relief: (1) violation of the VPPA; (2) violation of the Federal Act;

and (3) Intrusion Upon Seclusion. (*Id.* ¶¶ 213-247, 262-268.) The WESCA violation is brought on behalf of Wambold, a Pennsylvania resident, and the Pennsylvania Subclass. (*Id.* ¶¶ 248-260.)

**B. Plaintiffs' Subscription to RTA Media's Website.**

Wambold alleges that he became a subscriber to RTA Media's Website "in or around 2023." (ECF No. 1 ¶ 27.) Guptill, who Maine resident, alleges that he also became a subscriber to RTA Media's Website "in or around 2023." (*Id.* ¶ 28.) Plaintiffs have supplied RTA Media with their email addresses associated with their subscriptions to the Website. (Smith Decl. ¶ 7.) Based on the email addresses provided, RTA Media was able to confirm that both Wambold and Guptill are current subscribers to the Website. *(Id.)* Moreover, both Wambold and Guptill have renewed their Website subscriptions and/or purchased pay-per-view content on numerous occasions since their initial enrollment. (*Id.* ¶ 8.)

**C. The Website Subscription Process.**

Three different types of content can generally be access on the Website: (1) limited amounts of free content available to non-subscribers; (2) pay-per-view content available to non-subscribers and to subscribers with payment of a fee; and (3) on demand and live video content available to subscribers. (Smith Decl. ¶ 10.) In order to purchase pay-per-view content, purchasers select the desired event, which is placed in their online shopping cart. (*Id.* ¶ 11.) When they wish to complete their pay-per-view purchase, individuals must enter their billing and payment information and must also check a dialog box that confirms by

proceeding with their purchase they agree to RTA Media's Terms of Service Agreement applicable to the Website. (Smith Decl. ¶ 11.) Individuals purchasing a subscription to the Website proceed through identical steps in order process payment. (*Id.*)

In short, all pay-per-view purchasers and all subscribers to the Website must affirmatively click the dialog box confirming that they agree to the terms of RTA Media's Terms of Service Agreement to view any desired content. (*Id.* ¶ 12.) Plaintiffs' Complaint admits that they became subscribers to the Website in or around 2023. (ECF No. 1 ¶¶ 27-28.) Moreover, based on having been provided with the email addresses used to subscribe, RTA Media has confirmed that both Wambold and Guptill currently subscribe to the Website. (Smith Decl. ¶ 7.) Thus, neither Wambold nor Guptill could access the Website's subscription services without agreeing to RTA Media's Privacy Policy, which is expressly incorporated and hyperlinked in Section 3 of the Terms of Service Agreement. (*Id.* ¶¶ 12-13, Ex. A § 3.) Substantively, RTA Media's Privacy Policy contains a detailed description of the digital information that is collected from Website visitors and subscribers, how that digital information is used, it discloses the third parties with who the company may share such digital information, and it provides information as to how to restrict the collection of such digital information. (*Id.* ¶ 6.) More importantly for purposes of this Motion, neither Wambold nor Guptill could have subscribed to the Website or accessed pay-per-view content without expressly agreeing to RTA Media's Terms of Service. *(Id.* ¶ 13.)

### D. The Terms of Service Agreement Includes a Class Action Waiver Provision.

As the foregoing discussion establishes, neither Wambold nor Guptill could have subscribed to the Website or accessed pay-per-view content without expressly agreeing to RTA Media's Terms of Service. (Smith Decl. ¶ 13.) RTA Media's Terms of Service Agreement contains a clear, unambiguous and enforceable class action waiver provision. (*Id.* ¶ 14.) As argued herein, Plaintiffs' consent to and acceptance of RTA Media's Terms of Service Agreement is fatal to their ability to certify this case as a class action, thereby warranting dismissal of these allegations pursuant to Rule 12(b)(6), 12(f) and/or Rule 23(c)(1)(A).

Specifically, the Terms of Service Agreement's preamble expressly warns purchasers and subscribers that Section 10 "CONTAINS CLASS ACTION AND JURY TRIAL WAIVERS." (*Id.* ¶ 14, Ex. A at 1.) The preamble further advises purchasers and subscribers to:

> READ SECTION 10 CAREFULLY. BY PURCHASING, ENGAGING WITH, OR OTHERWISE USING THE SERVICE, YOU EXPRESSLY AGREE THAT DISPUTES BETWEEN YOU AND [RTA MEDIA] WILL BE RESOLVED BY BINDING, INDIVIDUAL ARBITRATION, AND **YOU HEREBY WAIVE YOUR RIGHT TO PARTICIPATE IN A CLASS ACTION LAWSUIT OR CLASS-WIDE ARBITRATION.** IF YOU DO NOT AGREE TO THESE TERMS, PLEASE IMMEDIATELY CEASE USE OF THE SERVICE.

(*Id.,* Ex. A at 1, emphasis added.)

Next, Section 10.5 of RTA Media's Terms of Service Agreement is entitled, in bold font, "**Waiver of Jury Trials, Class Actions, and Class Arbitrations**." (Smith Decl. ¶ 15, Ex. A § 10.5.) Section 10.5(B), which is entitled, once again in bold font, "**Waiver of**

**Class and Other Non-Individualized Relief**[.]" (Smith Decl. ¶ 16, Ex. A § 10.5(B).) Section 10.5(B) reads, in capitalized text, as follows:

> YOU AND [RTA MEDIA] AGREE THAT , EXCEPT AS OTHERWISE SPECIFIED IN THIS SECTION 10, (A) EACH OF US MAY BRING CLAIMS AGAINST THE OTHER ONLY ON AN INDIVIDUAL BASIS AND NOT ON A CLASS, REPRESENTATIVE, OR COLLECTIVE BASIS, AND THE PARTIES HEREBY WAIVE ALL RIGHTS TO HAVE ANY DISPUTE BE BROUGHT, HEARD, ADMINISTERED, RESOLVED, OR ARBITRATED ON A CLASS, COLLECTIVE, REPRESENTATIVE, OR MASS ACTION BASIS, AND (B) ONLY INDIVIDUAL RELIEF IS AVAILABLE, AND DISPUTES OF MORE THAN ONE CUSTOMER OR USER CANNOT BE ARBITRATED OR CONSOLIDATED WITH THOSE OF ANY OTHER CUSTOMER OR USER.

(*Id.*)

A class action waiver provision has been included in the applicable terms of service governing RTA Media's Website since its inception. (*Id.* ¶ 17.) In addition, Section 1 of RTA Media's Terms of Service Agreement expressly states that users and subscribers agree to any revised version of the agreements by continuing to use the Website. (*Id.*, Ex. A § 1 at 1.)

As argued below, Plaintiffs have consented to RTA Media's Terms of Service Agreement by subscribing to the Website. (*Id.* ¶¶ 12-13.) This includes agreeing to expressly waive their right to bring or participate in a class action lawsuit in exchange for being granted access to RTA Media's content available on the Website. (*Id.*) Accordingly, whether through application of 12(b)(6), 12(f), or Rule 23(c)(1)(A), the Court must dismiss or strike the class action allegations in Plaintiffs' Complaint.

## III. QUESTIONS PRESENTED

Whether Plaintiffs can maintain class action allegations and potentially seek class certification despite having consented to a waiver of class action rights under RTA Media's Terms of Service Agreement.

## IV. APPLICABLE LEGAL STANDARDS

RTA Media has brought its Motion on several procedural grounds – Rule 12(b)(6), Rule 12(f) and/or Rule 23(c)(1)(A). RTA Media's request for dismiss of Plaintiffs' class action allegations is factually predicated on their execution of a class action waiver contained in the company's Terms of Service Agreement required to be agreed to upon enrollment in a subscription to its Website. That said, adjudication of RTA Media's Motion gives rise to independent legal standards applicable to the Court's analysis – each of which independently, or all of which collectively, justify granting the relief sought.

### A. Applicable Rule 12(b)(6) Standards.

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). A claim is plausible on its face if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable" and demonstrates "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly,* 550 U.S. at 556-57). When ruling on a motion to dismiss, the court accepts the complaint's factual

allegations as true and draws all reasonable inferences in plaintiff's favor. *Id.*; *Ray v. Roane,* 948 F.3d 222, 226 (4th Cir. 2020). Courts, however, are not required to accept legal conclusions as true, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678.

**B. Applicable Rule 12(f) and Rule 23(c)(1)(A) Standards.**

Rule 12(f) allows a court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Rule 23(c)(1)(A) provides that "[a]t an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action. Fed. R. Civ. P. 23(c)(1)(A).

Generally, when viewing Rule 12(f) and Rule 23 in tandem, courts rarely make a class determination at the pleading stage. *See Williams v. Potomac Family Dining Grp. Operating Co., LLC.,* No. GHJ-19-1780, 2019 U.S. Dist. LEXIS 181604, 2019 WL 5309628, at *5 (D. Md. Oct. 21, 2019). However, "a motion to dismiss a complaint's class action allegations should be granted when it is clear from the face of the complaint that the plaintiff cannot and could not meet Rule 23's requirements for certification because the plaintiff has failed to properly alleged facts sufficient to make out a class or could establish no facts to make out a class." *Id.* Although a plaintiff retains the burden of proving class certification, a court analyzes a pre-discovery challenge to class certification under "the familiar standard of review for motions to dismiss under Rule 12(b)(6)." *Id.*

Proper application of the foregoing standards to RTA Media's Motion demonstrates that Plaintiffs cannot seek class action certification in this case. Accordingly, the Court should dismiss or strike Plaintiffs' class action allegations pursuant Rule 12(b)(6), Rule 12(f) and/or Rule 23(c)(1)(A).

## V. <u>ARGUMENT</u>

While RTA Media's Motion asserts numerous procedural grounds upon which its requested relief is sought, the core factual basis for doing so is straightforward – Plaintiffs agreed to the company's Terms of Service Agreement as a condition for subscribing to the Website and that agreement contained an express waiver of their ability to assert class action relief. Plaintiffs' agreement to RTA Media's Terms of Service Agreement is valid, enforceable under recent controlling precedent. *See Marriott II,* 2025 U.S. App. LEXIS 13492, at *3. Accordingly, regardless of the procedural mechanism employed by the Court that has been asserted by RTA Media, the conclusion is the same – Plaintiffs' class action allegations and request for class certification must be dismissed and/or stricken.

### A. The Court Can Properly Consider The Terms of Service Agreement.

RTA Media's Terms of Service Agreement is not attached to or specifically referenced in Plaintiffs' Complaint. Plaintiffs' Complaint, however, makes specific allegations concerning RTA Media's Website, that the Website does not disclose, inform, seek consent from subscribers during the subscription process, states that both Plaintiffs subscribed to the Website, and RTA Media has independently verified that Plaintiffs are current Website subscribers based on having been voluntarily provided their email

addresses provided while subscribing to the Website. (ECF No. 1 ¶¶ 9-11, 27-28, 179-184; Smith Decl. ¶¶ 7-8.) Under these circumstances, the Court is fully authorized to consider RTA Media's Terms of Service Agreement.

As noted above, moving to strike or deny class certification under Rule 12(f) and Rule 23(c)(1)(A) at the pleading stage is reviewed under the same standards applicable to a Rule 12(b)(6) motion to dismiss. *See Williams,* 2019 U.S. Dist. LEXIS 181604, 2019 WL 5309628, at *5. When a defendant moves to dismiss under Rule 12(b)(6), courts are limited to considering the sufficiency of the allegations set forth in the complaint and the "documents attached or incorporated into the complaint." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.,* 637 F.3d 435, 448 (4th Cir. 2011). Documents other than the pleadings are properly considered if they are either attached to the complaint as authorized by Rule 10(c) or attached to the motion to dismiss, so long as they are integral to the complaint and authentic. *See Blankenship v. Manchin,* 471 F.3d 523, 526 n.1 (4th Cir. 2006); *Phillips v. LCI Int'l, Inc.,* 190 F.3d 609, 618 (4th Cir. 1999).

Here, the Court is fully authorized to consider RTA Media's Terms of Service Agreement. First, RTA Media's subscription process is unquestionably integral to the allegations set forth in Plaintiffs' Complaint. Both Wambold and Guptill are specifically alleged to be subscribers to the Website, and the company has confirmed, based on Plaintiffs having provided the email addresses submitted when subscribing, that they are current Website subscribers. (ECF No. 1 ¶¶ 27-28; Smith Decl. ¶¶ 7-9, 11-12.) Plaintiffs have further alleged that RTA Media does not disclose, inform, seek consent to the

disclosure of their PII or sensitive information from subscribers during the subscription process. (ECF No. 1 ¶¶ 9-11, 179-184.) As discussed repeatedly, subscribers or pay-per-view purchases cannot process payment on the Website without expressly agreeing to RTA Media's Terms of Service Agreement. (Smith Decl. ¶¶ 11-13.)

Subscribers and pay-per-view purchasers also expressly agree to the Privacy Policy's terms under Section 3 of the Terms of Service Agreement. (*Id.*, Ex. A § 3.) Section 3 of the Terms of Service provides, once again, a highlighted link to the RTA Media's Privacy Policy. (*Id.*) Finally, the class certification sought by Plaintiffs seeks to include nationwide and Pennsylvania members "with a subscription to the Website . . . ." (ECF No. 1 ¶ 199.) Thus, the intended class members identified by Plaintiffs in their Complaint necessarily had to complete subscription purchase transactions, which would unquestionably require them to agree to RTA Media's Terms of Service Agreement.

In sum, RTA Media's Terms of Service Agreement is integral to the allegations set forth in Plaintiffs' Complaint. In fact, their individual claims for relief and all proposed class member claims for relief necessary require a subscription to RTA Media's Website. (ECF No. 1 ¶¶ 9-11, 27-28, 179-184.) A subscription, or even a pay-per-view purchase, to the Website requires, and has always required, an affirmative acknowledgement agreeing to RTA Media's Terms of Service Agreement. (Smith Decl. ¶¶ 11-12.) A subscription cannot be purchased without doing so. (*Id.*) RTA Media has submitted its Terms of Service Agreement through the sworn declaration of its designated corporate representative. (*Id.* ¶ 3, Ex. A.) As such, RTA Media has demonstrated that its submission of the Terms of

Service Agreement is both integral to the complaint and authentic. *See Blankenship,* 471 F.3d at 526 n.1; *Phillips,* 190 F.3d at 618. Accordingly, the Court is fully authorized to consider the Terms of Service Agreement in adjudicating RTA Media's Motion. When the Court does so, it will appreciate the merits of RTA Media's Motion and grant its requested relief.

**B. Plaintiffs Have Waived Their Right to Seek Class Action Relief.**

Once the Court correctly concludes that it can properly consider the Terms of Service Agreement in connection with adjudicating RTA Media's Motion, the inquiry then turns to whether Plaintiffs have agreed to a waive their right to class action relief through enforceable terms recited in Section 10.5(b) of the Terms of Service. Based on recent controlling precedent from the United States Court of Appeals for the Fourth Circuit (the "Fourth Circuit") reflected in the *Marriott II* decision, RTA Media asserts that Plaintiffs have expressly waived their rights to assert class action relief in this case. Accordingly, Plaintiffs' class action allegations must be dismissed or stricken pursuant to Rule 12(b)(6), Rule 12(f) and/or Rule 23(c)(1)(A).

To begin with, the United States Supreme Court has affirmed that parties have the right to waive class-action litigation by contract. *American Exp. Co. v. Italian Colors Rest.,* 570 U.S. 228, 234, 133 S. Ct. 2301, 186 L. Ed. 2d 417 (2013) (holding that congressional approval of Rule 23 does not "establish an entitlement to class proceedings"; rejecting proposition that "federal law secures a nonwaivable *opportunity* to vindicate federal policies by satisfying the procedural strictures of Rule 23"). Moreover, courts now

routinely enforce contractual class action waivers – including in cases that do not involve an arbitration agreement. *Marriott II,* 2025 U.S. App. LEXIS 13492, at *21-22. As stated by the Fourth Circuit, "when parties to a contract agree that claims must be handled individually in every respect and without any form of collective or consolidated treatment, they know how to say so." *Id.* at *17 n.4.

While the Fourth Circuit's decision to uphold the class action waiver at issue in *Marriott II* involved application of New York law, an identical determination would have been reached under North Carolina law. *See id.* at *23. Under North Carolina law, nonnegotiable contracts of adhesion are permissible and not automatically invalidated. *See Greene v. OneMain Fin. Grp., LLC,* No. 1:17-CV-848, 2018 U.S. Dist. LEXIS 190201, 2018 WL 5831681, at *4 (M.D.N.C. Nov. 7, 2018). On the contrary, "[u]nder North Carolina law, online consumer agreements are valid and enforceable when a user affirmatively acknowledges and agrees to contractual terms by checking a box or clicking a button as a condition of proceeding with his transaction." *Moreno v. Expedia,* No. 3:18-CV-105, 2018 U.S. Dist. LEXIS 104161, 2018 WL 3059617, at *3 (W.D.N.C. June 20, 2018). The court's decision in *Moreno* compelled arbitration where the plaintiff was required to acknowledge reading and accepting terms of use (which included an arbitration agreement and hyperlink to the applicable policies) prior to successfully using the defendant's product. *Id.*; *accord Corpening v. Moneylion Inc.,* 2020 U.S. Dist. LEXIS 272482, at *13-15 (W.D.N.C. 2020) (upholding arbitration agreement language in terms of use that required plaintiff to affirmatively click a button to consent to the terms and that

contained arbitration language in all capital letters and bold font advising that they must read the arbitration provision because it sets out when and how claims will be arbitrated and not litigated in court).

Turning to the class action waiver recited in RTA Media's Terms of Service Agreement, the Fourth Circuit has recently upheld and enforced such a provision in the *Marriott II* decision. *See Marriott II,* 2025 U.S. App. LEXIS 13492, at *23. Next, the class action waiver issue at issue in this case clearly complies with the requirements of other similar provisions that have been deemed enforceable in this jurisdiction.

First, subscribers to the Website could not complete their purchase and obtain access to RTA Media's services without agreeing to the company's Terms of Service Agreement by clicking a dialog box upon checkout to complete their transaction (Smith Decl. ¶¶ 11-12.) Such required action by a subscriber constitutes affirmative assent to such terms and falls into the authorized "clickwrap" category of transactions, which create enforceable contractual agreements in online transactions. *See Corpening,* 2020 U.S. Dist. LEXIS 272482, at *13-15.

Next, the Terms of Service Agreement's preamble expressly warns purchasers and subscribers that Section 10 "CONTAINS CLASS ACTION AND JURY TRIAL WAIVERS." (Smith Decl. ¶ 14, Ex. A at 1.) The preamble further advises purchasers and subscribers to:

> READ SECTION 10 CAREFULLY. BY PURCHASING, ENGAGING WITH, OR OTHERWISE USING THE SERVICE, YOU EXPRESSLY AGREE THAT DISPUTES BETWEEN YOU AND [RTA MEDIA] WILL

> BE RESOLVED BY BINDING, INDIVIDUAL ARBITRATION, AND **YOU HEREBY WAIVE YOUR RIGHT TO PARTICIPATE IN A CLASS ACTION LAWSUIT OR CLASS-WIDE ARBITRATION.** IF YOU DO NOT AGREE TO THESE TERMS, PLEASE IMMEDIATELY CEASE USE OF THE SERVICE.

(Smith Decl. ¶ 14, Ex. A at 1, emphasis added.) Such language is virtually identical to the language and stylization presented to the court in the *Corpening* decision, which was found to adequately advise the adverse party of key, relevant terms and that they were contracting to such terms through their enrollment in provided services. *See Corpening,* 2020 U.S. Dist. LEXIS 272482, at *13-15.

Furthermore, Section 10.5 of RTA Media's Terms of Service Agreement is entitled, in bold font, "**Waiver of Jury Trials, Class Actions, and Class Arbitrations**." (Smith Decl. ¶ 15, Ex. A § 10.5.) Section 10.5(B), which is entitled, once again in bold font, "**Waiver of Class and Other Non-Individualized Relief**[.]" (*Id.* ¶ 16, Ex. A § 10.5(B).) Section 10.5(B) reads, in capitalized text, as follows:

> YOU AND [RTA MEDIA] AGREE THAT , EXCEPT AS OTHERWISE SPECIFIED IN THIS SECTION 10, (A) EACH OF US MAY BRING CLAIMS AGAINST THE OTHER ONLY ON AN INDIVIDUAL BASIS AND NOT ON A CLASS, REPRESENTATIVE, OR COLLECTIVE BASIS, AND THE PARTIES HEREBY WAIVE ALL RIGHTS TO HAVE ANY DISPUTE BE BROUGHT, HEARD, ADMINISTERED, RESOLVED, OR ARBITRATED ON A CLASS, COLLECTIVE, REPRESENTATIVE, OR MASS ACTION BASIS, AND (B) ONLY INDIVIDUAL RELIEF IS AVAILABLE, AND DISPUTES OF MORE THAN ONE CUSTOMER OR USER CANNOT BE ARBITRATED OR CONSOLIDATED WITH THOSE OF ANY OTHER CUSTOMER OR USER.

*(Id.,* Ex. A § 10.5(B).) The employment of clearly discernable bold text identifying that Section 10 includes a class action waiver, use of additional bold text in the title of Section

10(B) that further advises of a class action waiver by the subscriber, and capitalized text through out Section 10(B)'s class action waiver provision that further calls attention to the subscriber that significant rights are implicated, only serves to underscore the length with which RTA Media has gone to assure complete assent with all terms contained in the company's Terms of Service Agreement. More importantly, these actions demonstrate the enforceability of RTA Media's class action waiver provision under controlling case law. *See Marriott II,* 2025 U.S. App. LEXIS 13492, at *23; *Corpening,* 2020 U.S. Dist. LEXIS 272482, at *13-15.

In sum, Plaintiffs, admitted and established current Website subscribers, simply could not have accessed either on demand or pay-per-view content without necessarily assenting to RTA Media's Terms of Service Agreement. (Smith Decl. ¶¶ 11-13.) Moreover, RTA Media's class action waiver provision recited in its Terms of Service is valid and enforceable under above cited authorities. *See Marriott II,* 2025 U.S. App. LEXIS 13492, at *23; *Corpening,* 2020 U.S. Dist. LEXIS 272482, at *13-15. As such, the class action wavier provision contained in Section 10(B) of RTA Media's Terms of Service Agreement must be enforced. Once enforced, the class action waiver provision precludes Plaintiffs from maintaining their class action certification allegations in this case. Accordingly, Plaintiffs' class action certification allegations must be dismissed and/or stricken pursuant to Rule 12(b)(6), Rule 12(f) and/or Rule 23(c)(1)(A).

## VI. CONCLUSION

Based on the foregoing, RTA Media respectfully requests the Court dismiss and/or strike Plaintiffs' class action allegations and deny their ability to seek class certification pursuant to Rule 12(b)(6), Rule 12(f) and/or Rule 23(c)(1)(A), together with any and all other relief that it deems just and appropriate.

This 30th day of June 2025.

**WILSON ELSER MOSKOWITZ**
**EDELMAN & DICKER, LLP**

/s/ Chanda L. McClain
Chanda L. McClain
N.C. State Bar No. 56537
227 W. Trade St., Ste. 300
Charlotte, North Carolina 28202
Telephone: (704) 302-1289
chanda.mcclain@wilsonelser.com
*Attorney for Defendant RTA Media Holdings, LLC d/b/a Racing America*

## CERTIFICATE OF SERVICE

I hereby certify that on this day the foregoing was electronically filed using the Court's electronic filing system which will electronically serve the following counsel of record:

David M. Wilkerson
Wilkerson Justus PLLC
PO Box 54
Asheville, NC 28802
dwilkerson@wilkersonjustus.com

Mark S. Reich
Levi & Korsinsky, LLP
33 Whitehall Street, Floor 17
New York, NY 10004
mreich@zlk.com

In addition, I served the following counsel, who have not yet appeared in this action, via electronic mail on the same day:

Gary S. Ishimoto
Alyssa Tolentino
Levi & Korsinsky, LLP
33 Whitehall Street, Floor 17
New York, NY 10004
gishimoto@zlk.com
atolentino@zlk.com

This the 30th day of June 2025.

/s/ Chanda L. McClain
Chanda L. McClain