**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**
**Civil Action No.: 1:25-cv-00096-CCE-JLW**

MICHAEL WAMBOLD and ROBERT GUPTILL, On Behalf of Themselves and All Others Similarly Situated,

*Plaintiffs*,

v.

RTA MEDIA HOLDINGS, LLC D/B/A RACING AMERICA,

*Defendant*.

**DEFENDANT RTA MEDIA HOLDINGS, LLC'S BRIEF IN SUPPORT OF MOTION TO DISMISS CLASS ACTION ALLEGATIONS PURSUANT TO FRCP 12(b)(6), 12(f) AND/OR 23(c)(1)(A)**

**ORAL ARGUMENT REQUESTED PURSUANT TO L.R. 7.3(c)(1)**

Defendant RTA Media Holdings, LLC d/b/a Racing America ("RTA Media") hereby moves to dismiss the class action allegations asserted in Plaintiff Michael Wambold and Plaintiff Robert Guptill's Class Action Complaint pursuant to Rule 12(b)(6), Rule 12(f) and Rule 23(c)(1)(A) of the Federal Rules of Civil Procedure. In support of its Motion, Defendant states as follows:

## I. NATURE OF THE MATTER

Michael Wambold ("Wambold") and Robert Guptill ("Guptill", and collectively, "Plaintiffs") commenced this action seeking class action certification based on RTA Media's alleged unauthorized dissemination of certain personally identifiable information ("PII") without their consent in connection with their agreement to subscribe to RTA Media's video content platform located at www.racingamerica.tv (the "Website"). *See* Complaint ¶ 1. Plaintiffs cannot maintain their class action allegations in this action because they expressly waived such rights when agreeing to RTA Media's Viewer Terms

of Service Agreement (the "Terms of Service Agreement" or "Terms of Service") upon subscribing to the Website. Smith Decl. ¶¶ 9, 11-13, Ex. A.

Thus, the Court's adjudication of the Motion is straightforward. First, the United States Court of Appeals for the Fourth Circuit recently affirmed the enforceability of class action waiver provisions such as that relied upon in the Motion. *See Maldini v. Marriott Int'l, Inc.,* 2025 U.S. App. LEXIS 13492, at *14 (4th Cir. June 5, 2025) ("*Marriott II*"). RTA Media's Terms of Service Agreement, which the Plaintiffs agreed to upon subscribing to the Website and then consented to all amendments thereto by maintaining their subscriptions, clearly contains a class action waiver provision, which precludes their ability to seek class action certification or relief in this action. Smith Decl. ¶¶ 9, 11-13, Ex. A. Accordingly, whether a determination is reached by the Court under Rule 12(b)(6), Rule 12(f) and/or Rule 23(c)(1)(A), the result is the same—Plaintiffs' class action allegations and request for class certification cannot proceed and must be dismissed or stricken.

## II. STATEMENT OF FACTS

### A. Overview of Plaintiffs' Allegations.

Plaintiffs' Complaint seeks class action certification on behalf of all persons who subscribed to the Website, which is dedicated to offering streaming, pay-per-view racing, and NASCAR Cup Team content, as well as other related, original, exclusive content. Complaint ¶¶ 1-4. Plaintiffs allege the Website employs certain data tracking technology by deploying certain pixels, such as the Meta/Facebook pixel and Google Ads pixel, which are used to collect information concerning subscriber's video content viewing history and

other "sensitive information", also known as personally identifiable information ("PII"). *Id.* ¶¶ 103-132. These pixels are alleged to transmit the subscriber's purported sensitive information to third-party providers without the subscriber's consent or authorization. *Id.* Plaintiffs allege this conduct constitutes violations of: (1) the Video Privacy Protection Act (the "VPPA"); (2) the Federal Wiretap Act; (3) the Pennsylvania Wiretapping and Electronic Surveillance Control Act ("WESCA"); and (4) Intrusion Upon Seclusion. *Id.* ¶¶ 213-268.

Plaintiffs seek class certification as to a "Nationwide Class" composed of all persons in the United States that subscribed to the Website and had their PII disclosed to third parties without their consent, as well as a "Pennsylvania Subclass" composed of all persons in Pennsylvania that subscribed to the Website and had their PII disclosed without their consent. *Id*. ¶¶ 199-201. Plaintiffs and the Nationwide Class seeks recovery on the following claims for relief: (1) violation of the VPPA; (2) violation of the Federal Wiretap Act; and (3) Intrusion Upon Seclusion. *Id.* ¶¶ 213-247, 262-268. The WESCA violation is brought on behalf of Wambold, a Pennsylvania resident, and the Pennsylvania Subclass. *Id.* ¶¶ 248-260.

**B. Plaintiffs' Subscription to the Website.**

Wambold alleges he became a subscriber to the Website "in or around 2023." Complaint ¶ 27. Guptill, a Maine resident, alleges he also became a subscriber to the Website "in or around 2023." *Id.* ¶ 28. Plaintiffs supplied RTA Media with the email addresses associated with their subscriptions to the Website. Smith Decl. ¶ 7. Based on the

email addresses provided, RTA Media confirmed that Wambold last subscribed to the Website on June 22, 2025, and Guptill last subscribed to the Website on September 19, 2025. Wambold and Guptill renewed their subscriptions to the Website and purchased pay-per-view content on the Website numerous times since their initial enrollments. *Id*. ¶ 8.

**C. The Website Subscription Process.**

Visitors can access three types of content on the Website: (1) limited amounts of free content available to non-subscribers; (2) pay-per-view content available to both non-subscribers and subscribers with payment of a fee; and (3) on-demand and live video content available to subscribers. Smith Decl. ¶ 10. To purchase pay-per-view content, an individual selects the desired event, which is placed in his online shopping cart. *Id.* ¶ 11. When the individual wishes to complete their pay-per-view purchase, he must enter his billing and payment information and must also check a dialog box that confirms by proceeding with his purchase he agrees to RTA Media's Terms of Service Agreement applicable to the Website. *Id.* The Website will not process the individual's payment until he agrees to RTA Media's Terms of Service Agreement. *Id.* Individuals purchasing a subscription to the Website proceed through identical steps in order to process payment. *Id.*

In short, all pay-per-view purchasers and all subscribers to the Website must affirmatively click the dialog box confirming they agree to the terms of RTA Media's Terms of Service Agreement to view any desired content. *Id.* ¶ 12. Plaintiffs' Complaint admits that they became subscribers to the Website in or around 2023. Complaint ¶¶ 27-

28. Moreover, based on Plaintiffs providing RTA Media with the email addresses they used to subscribe, RTA Media confirmed that both Wambold and Guptill last subscribed to the Website on June 22, 2025, and September 19, 2025, respectively. Thus, neither Wambold nor Guptill could access the Website's subscription services without agreeing to RTA Media's Privacy Policy, which is expressly incorporated and hyperlinked in Section 3 of the Terms of Service Agreement. Smith Decl. ¶¶ 12-13, Ex. A § 3. Substantively, RTA Media's Privacy Policy contains a detailed description of the digital information collected from Website visitors and subscribers and how that digital information is used. *Id.* ¶ 6. The policy also discloses the third parties with whom the company may share such digital information and details how to restrict the collection of such digital information. *Id*. As mentioned above, neither Wambold, nor Guptill, could have subscribed to the Website or accessed pay-per-view content without expressly agreeing to RTA Media's Terms of Service. *Id.* ¶ 13.

### D. The Terms of Service Agreement Includes a Class Action Waiver Provision.

As the foregoing discussion establishes, neither Wambold, nor Guptill, could have subscribed to the Website or accessed pay-per-view content without expressly agreeing to RTA Media's Terms of Service. Smith Decl. ¶ 13. RTA Media's Terms of Service Agreement contains a clear, unambiguous, and enforceable class action waiver provision. *Id.* ¶ 14, Ex. A § 10.5(B). As argued herein, Plaintiffs' consent to, and acceptance of, RTA Media's Terms of Service Agreement is fatal to their ability to certify this case as a class

action, thereby warranting dismissal of these allegations pursuant to Rule 12(b)(6), 12(f) and Rule 23(c)(1)(A).

Specifically, the Terms of Service Agreement's preamble expressly warns purchasers and subscribers that Section 10 "CONTAINS CLASS ACTION AND JURY TRIAL WAIVERS." *Id.* ¶ 14, Ex. A § 1. The preamble further advises purchasers and subscribers to:

> READ SECTION 10 CAREFULLY. BY PURCHASING, ENGAGING WITH, OR OTHERWISE USING THE SERVICE, YOU EXPRESSLY AGREE THAT DISPUTES BETWEEN YOU AND [RTA MEDIA] WILL BE RESOLVED BY BINDING, INDIVIDUAL ARBITRATION, AND **YOU HEREBY WAIVE YOUR RIGHT TO PARTICIPATE IN A CLASS ACTION LAWSUIT OR CLASS-WIDE ARBITRATION.** IF YOU DO NOT AGREE TO THESE TERMS, PLEASE IMMEDIATELY CEASE USE OF THE SERVICE.

*Id.* (emphasis added).

Next, Section 10.5 of RTA Media's Terms of Service Agreement is titled, in bold font, "**Waiver of Jury Trials, Class Actions, and Class Arbitrations**." Smith Decl. ¶ 15, Ex. A § 10.5. Section 10.5(B), which is titled, once again in bold font, "**Waiver of Class and Other Non-Individualized Relief**[.]" Smith Decl. ¶ 16, Ex. A § 10.5(B). Section 10.5(B) reads, in capitalized text, as follows:

> YOU AND [RTA MEDIA] AGREE THAT , EXCEPT AS OTHERWISE SPECIFIED IN THIS SECTION 10, (A) EACH OF US MAY BRING CLAIMS AGAINST THE OTHER ONLY ON AN INDIVIDUAL BASIS AND NOT ON A CLASS, REPRESENTATIVE, OR COLLECTIVE BASIS, AND THE PARTIES HEREBY WAIVE ALL RIGHTS TO HAVE ANY DISPUTE BE BROUGHT, HEARD, ADMINISTERED, RESOLVED, OR ARBITRATED ON A CLASS, COLLECTIVE, REPRESENTATIVE, OR MASS ACTION BASIS, AND (B) ONLY INDIVIDUAL RELIEF IS AVAILABLE, AND DISPUTES OF MORE

> THAN ONE CUSTOMER OR USER CANNOT BE ARBITRATED OR CONSOLIDATED WITH THOSE OF ANY OTHER CUSTOMER OR USER.

*Id.*

A class action waiver provision has been included in the applicable terms of service governing the Website since its inception. *Id.* ¶ 17, *See* prior Terms of Service attached hereto as "Exhibit B". In addition, Section 1 of RTA Media's Terms of Service Agreement expressly states that users and subscribers agree to any revised version of the agreements by continuing to use the Website. Smith Decl., Ex. A § 1.

As argued below, Plaintiffs consented to RTA Media's Terms of Service Agreement by subscribing to the Website. *Id.* ¶¶ 12-13. This includes agreeing to expressly waive their right to bring or participate in a class action lawsuit in exchange for being granted access to RTA Media's content available on the Website. *Id.* Accordingly, whether through application of Rule 12(b)(6), 12(f), or 23(c)(1)(A), the Court must dismiss or strike the class action allegations in Plaintiffs' Complaint.

## III. QUESTIONS PRESENTED

Whether Plaintiffs can maintain class action allegations and potentially seek class certification despite having consented to a waiver of class action rights under RTA Media's Terms of Service Agreement.

## IV. APPLICABLE LEGAL STANDARDS

RTA Media brings its Motion on several procedural grounds—Rule 12(b)(6), Rule 12(f), and Rule 23(c)(1)(A). RTA Media's request for dismissal of Plaintiffs' class action

allegations is predicated on their execution of a class action waiver contained in RTA Media's Terms of Service Agreement, which visitors must agree to before subscribing to the Website or accessing pay-per-view content. That said, adjudication of the Motion gives rise to independent legal standards applicable to the Court's analysis—each of which independently, or all of which collectively, justify granting the relief sought.

**A. Applicable Rule 12(b)(6) Standards.**

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). A claim is plausible on its face if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable" and demonstrates "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly,* 550 U.S. at 556-57). When ruling on a motion to dismiss, the court accepts the complaint's factual allegations as true and draws all reasonable inferences in plaintiff's favor. *See Id.*; *See* also *Ray v. Roane,* 948 F.3d 222, 226 (4th Cir. 2020). Courts, however, are not required to accept legal conclusions as true, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678.

**B. Applicable Rule 12(f) and Rule 23(c)(1)(A) Standards.**

Rule 12(f) allows a court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Rule

23(c)(1)(A) provides that "[a]t an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action. Fed. R. Civ. P. 23(c)(1)(A).

Generally, when viewing Rule 12(f) and Rule 23 in tandem, courts rarely make a class determination at the pleading stage. *See Williams v. Potomac Family Dining Grp. Operating Co., LLC.,* No. GHJ-19-1780, 2019 U.S. Dist. LEXIS 181604, 2019 WL 5309628, at *5 (D. Md. Oct. 21, 2019). However, "a motion to dismiss a complaint's class action allegations should be granted when it is clear from the face of the complaint that the plaintiff cannot and could not meet Rule 23's requirements for certification because the plaintiff has failed to properly allege facts sufficient to make out a class or could establish no facts to make out a class." *Id.* Although a plaintiff retains the burden of proving class certification, a court analyzes a pre-discovery challenge to class certification under "the familiar standard of review for motions to dismiss under Rule 12(b)(6)." *Id.*

Proper application of the foregoing standards to the Motion demonstrates that Plaintiffs cannot seek class action certification in this case. Accordingly, the Court should dismiss or strike Plaintiffs' class action allegations pursuant Rule 12(b)(6), Rule 12(f) and Rule 23(c)(1)(A).

## **V. ARGUMENT**

While the Motion asserts numerous procedural grounds upon which seeks the requested relief, the core factual basis for doing so is straightforward—Plaintiffs agreed to the company's Terms of Service Agreement as a condition for subscribing to the Website

and that agreement contained an express waiver of their ability to assert class action relief. Plaintiffs' agreement to RTA Media's Terms of Service Agreement is valid and enforceable under recent controlling precedent. *See Marriott II,* 2025 U.S. App. LEXIS 13492, at *3. Accordingly, regardless of the procedural mechanism asserted by RTA Media and employed by the Court, the conclusion is the same—Plaintiffs' class action allegations and request for class certification must be dismissed or stricken.

**A. The Court Can Properly Consider the Terms of Service Agreement.**

RTA Media's Terms of Service Agreement is not attached to or specifically referenced in Plaintiffs' Complaint. However, Plaintiffs' Complaint makes specific allegations concerning the Website (the Website does not disclose, inform, or seek consent from subscribers during the subscription process) and further indicates both Plaintiffs subscribed to the Website, which RTA Media verified after Plaintiffs confirmed the email addresses they provided when subscribing to the Website. Complaint ¶¶ 9-11, 27-28, 179-184; Smith Decl. ¶¶ 7-8.). The Court also allowed limited discovery in connection with the class action waiver issue, finding "[r]esolution of issues related to the existence of a valid class action waiver should be resolved early in the case." ECF No. 25. Under these circumstances, the Court can consider RTA Media's Terms of Service Agreement even though Plaintiff did not attach them to the Complaint.

As noted above, moving to strike or deny class certification under Rule 12(f) and Rule 23(c)(1)(A) at the pleading stage is reviewed under the same standards applicable to a Rule 12(b)(6) motion to dismiss. *See Williams,* 2019 U.S. Dist. LEXIS 181604, 2019 WL

5309628, at *5. When a defendant moves to dismiss under Rule 12(b)(6), courts are limited to considering the sufficiency of the allegations set forth in the complaint and the "documents attached or incorporated into the complaint." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.,* 637 F.3d 435, 448 (4th Cir. 2011). Documents other than the pleadings are properly considered if they are either attached to the complaint as authorized by Rule 10(c) or attached to the motion to dismiss, so long as they are integral to the complaint and authentic. *See Blankenship v. Manchin,* 471 F.3d 523, 526 n.1 (4th Cir. 2006); *Phillips v. LCI Int'l, Inc.,* 190 F.3d 609, 618 (4th Cir. 1999).

Here, the Court can consider RTA Media's Terms of Service Agreement. First, RTA Media's subscription process is unquestionably integral to the allegations set forth in Plaintiffs' Complaint. Both Wambold and Guptill are specifically alleged to be subscribers to the Website, and the company has confirmed, based on Plaintiffs providing the email addresses submitted when they subscribed, that Wambold last subscribed to the Website on June 22, 2025, and Guptill last subscribed to the Website on September 19, 2025. Complaint ¶¶ 27-28; Smith Decl. ¶¶ 7-9, 11-12. Plaintiffs further alleged RTA Media does not disclose, inform, or seek consent to the disclosure of PII or sensitive information from subscribers during the subscription process. Complaint ¶¶ 9-11, 179-184. As discussed repeatedly, subscribers or pay-per-view purchases cannot process payment on the Website without expressly agreeing to RTA Media's Terms of Service Agreement. Smith Decl. ¶¶ 11-13.

Subscribers and pay-per-view purchasers also expressly agree to the Privacy Policy's terms under Section 3 of the Terms of Service Agreement. *Id.*, Ex. A § 3. Section 3 of the Terms of Service provides, once again, a highlighted link to the RTA Media's Privacy Policy. *Id.* Finally, the class certification sought by Plaintiffs seeks to include nationwide and Pennsylvania members "with a subscription to the Website . . . ." Complaint ¶ 199. Thus, the intended class members identified by Plaintiffs in their Complaint necessarily had to complete subscription purchase transactions, which would unquestionably require them to agree to RTA Media's Terms of Service Agreement.

In sum, RTA Media's Terms of Service Agreement is integral to the allegations set forth in Plaintiffs' Complaint. In fact, their individual claims for relief, as well as all proposed class member claims for relief, necessary require a subscription to RTA Media's Website. Complaint ¶¶ 9-11, 27-28, 179-184. A subscription, or even a pay-per-view purchase, to the Website has always required an affirmative acknowledgement agreeing to RTA Media's Terms of Service Agreement. Smith Decl. ¶¶ 11-12. A subscription cannot be purchased without doing so. *Id.* RTA Media submitted its Terms of Service Agreement through the sworn declaration of its designated corporate representative. *Id.* ¶ 3, Ex. A. As such, RTA Media has demonstrated that its submission of the Terms of Service Agreement is both integral to the complaint and authentic. *See Blankenship,* 471 F.3d at 526 n.1; *Phillips,* 190 F.3d at 618. Accordingly, the Court can consider the Terms of Service Agreement in adjudicating the Motion.

**B. Plaintiffs Waived Their Right to Seek Class Action Relief.**

Once the Court concludes it can properly consider the Terms of Service Agreement in connection with adjudicating the Motion, the inquiry turns to whether Plaintiffs have agreed to a waive their right to class action relief through enforceable terms recited in Section 10.5(b) of the Terms of Service. Based on recent controlling precedent from the United States Court of Appeals for the Fourth Circuit in the *Marriott II* decision, RTA Media asserts Plaintiffs have expressly waived their rights to assert class action relief in this case. Accordingly, Plaintiffs' class action allegations must be dismissed or stricken pursuant to Rule 12(b)(6), Rule 12(f) or Rule 23(c)(1)(A).

The United States Supreme Court affirmed that parties have the right to waive class-action litigation by contract. *American Exp. Co. v. Italian Colors Rest.,* 570 U.S. 228, 234, 133 S. Ct. 2301, 186 L. Ed. 2d 417 (2013) (holding that congressional approval of Rule 23 does not "establish an entitlement to class proceedings"; rejecting proposition that "federal law secures a nonwaivable *opportunity* to vindicate federal policies by satisfying the procedural strictures of Rule 23"). Moreover, courts now routinely enforce contractual class action waivers—including in cases that do not involve an arbitration agreement. *See Marriott II,* 2025 U.S. App. LEXIS 13492, at *21-22. As stated by the Fourth Circuit, "when parties to a contract agree that claims must be handled individually in every respect and without any form of collective or consolidated treatment, they know how to say so." *Id.* at *17 n.4.

While the Fourth Circuit's decision to uphold the class action waiver at issue in *Marriott II* involved application of New York law, an identical determination would have been reached under North Carolina law. *See Id.* at *23. Under North Carolina law, nonnegotiable contracts of adhesion are permissible and not automatically invalidated. *See Greene v. OneMain Fin. Grp., LLC,* No. 1:17-CV-848, 2018 U.S. Dist. LEXIS 190201, 2018 WL 5831681, at *4 (M.D.N.C. Nov. 7, 2018). On the contrary, "[u]nder North Carolina law, online consumer agreements are valid and enforceable when a user affirmatively acknowledges and agrees to contractual terms by checking a box or clicking a button as a condition of proceeding with his transaction." *Moreno v. Expedia,* No. 3:18-CV-105, 2018 U.S. Dist. LEXIS 104161, 2018 WL 3059617, at *3 (W.D.N.C. June 20, 2018). The court's decision in *Moreno* compelled arbitration where the plaintiff was required to acknowledge reading and accepting terms of use (which included an arbitration agreement and hyperlink to the applicable policies) prior to successfully using the defendant's product. *Id.*; *accord Corpening v. Moneylion Inc.,* 2020 U.S. Dist. LEXIS 272482, at *13-15 (W.D.N.C. 2020) (upholding arbitration agreement language in terms of use that required plaintiff to affirmatively click a button to consent to the terms and that contained arbitration language in all capital letters and bold font advising that they must read the arbitration provision because it sets out when and how claims will be arbitrated and not litigated in court).

Turning to the class action waiver recited in RTA Media's Terms of Service Agreement, the Fourth Circuit recently upheld and enforced such a provision in the

*Marriott II* decision. *See Marriott II,* 2025 U.S. App. LEXIS 13492, at *23. Next, the class action waiver issue at issue in this case clearly complies with the requirements of other similar provisions that have been deemed enforceable in this jurisdiction.

First, visitors to the Website could not complete their purchase or obtain access to RTA Media's subscription services without agreeing to the company's Terms of Service Agreement by clicking a dialog box upon checkout to complete their transaction. Smith Decl. ¶¶ 11-12. Such required action by a subscriber constitutes affirmative assent to such terms and falls into the authorized "clickwrap" category of transactions, which create enforceable contractual agreements in online transactions. *See Corpening,* 2020 U.S. Dist. LEXIS 272482, at *13-15.

Next, the Terms of Service Agreement's preamble expressly warns purchasers and subscribers that Section 10 "CONTAINS CLASS ACTION AND JURY TRIAL WAIVERS." Smith Decl. ¶ 14, Ex. A at 1. The preamble further advises purchasers and subscribers to:

> READ SECTION 10 CAREFULLY. BY PURCHASING, ENGAGING WITH, OR OTHERWISE USING THE SERVICE, YOU EXPRESSLY AGREE THAT DISPUTES BETWEEN YOU AND [RTA MEDIA] WILL BE RESOLVED BY BINDING, INDIVIDUAL ARBITRATION, AND **YOU HEREBY WAIVE YOUR RIGHT TO PARTICIPATE IN A CLASS ACTION LAWSUIT OR CLASS-WIDE ARBITRATION.** IF YOU DO NOT AGREE TO THESE TERMS, PLEASE IMMEDIATELY CEASE USE OF THE SERVICE.

*Id*. (emphasis added). Such language is virtually identical to the language and stylization presented to the court in the *Corpening* decision, which was found to adequately advise the adverse party of key, relevant terms and that they were contracting to such terms through

their enrollment in provided services. *See Corpening,* 2020 U.S. Dist. LEXIS 272482, at *13-15.

Furthermore, Section 10.5 of RTA Media's Terms of Service Agreement is titled, in bold font, "**Waiver of Jury Trials, Class Actions, and Class Arbitrations**." Smith Decl. ¶ 15, Ex. A § 10.5. Section 10.5(B), which is titled, once again in bold font, "**Waiver of Class and Other Non-Individualized Relief**" (*Id.* ¶ 16, Ex. A § 10.5(B)) reads, in capitalized text, as follows:

> YOU AND [RTA MEDIA] AGREE THAT , EXCEPT AS OTHERWISE SPECIFIED IN THIS SECTION 10, (A) EACH OF US MAY BRING CLAIMS AGAINST THE OTHER ONLY ON AN INDIVIDUAL BASIS AND NOT ON A CLASS, REPRESENTATIVE, OR COLLECTIVE BASIS, AND THE PARTIES HEREBY WAIVE ALL RIGHTS TO HAVE ANY DISPUTE BE BROUGHT, HEARD, ADMINISTERED, RESOLVED, OR ARBITRATED ON A CLASS, COLLECTIVE, REPRESENTATIVE, OR MASS ACTION BASIS, AND (B) ONLY INDIVIDUAL RELIEF IS AVAILABLE, AND DISPUTES OF MORE THAN ONE CUSTOMER OR USER CANNOT BE ARBITRATED OR CONSOLIDATED WITH THOSE OF ANY OTHER CUSTOMER OR USER.

*Id.* The employment of clearly discernable bold text identifying that Section 10 includes a class action waiver, use of additional bold text in the title of Section 10(B) that further advises of a class action waiver by the subscriber, and capitalized text throughout Section 10(B)'s class action waiver provision that further calls attention to the subscriber that significant rights are implicated, only serves to underscore the length RTA Media has gone to assure complete assent to all terms contained in the company's Terms of Service Agreement. More importantly, these actions demonstrate the enforceability of RTA

Media's class action waiver provision under controlling case law. *See Marriott II,* 2025 U.S. App. LEXIS 13492, at *23; *Corpening,* 2020 U.S. Dist. LEXIS 272482, at *13-15.

In sum, Plaintiffs, admitted and established Website subscribers, simply could not have accessed either on demand or pay-per-view content without necessarily assenting to RTA Media's Terms of Service Agreement. Smith Decl. ¶¶ 11-13. Moreover, RTA Media's class action waiver provision recited in its Terms of Service is valid and enforceable under the above cited authorities. *See Marriott II,* 2025 U.S. App. LEXIS 13492, at *23; *Corpening,* 2020 U.S. Dist. LEXIS 272482, at *13-15. As such, the class action wavier provision contained in Section 10(B) of RTA Media's Terms of Service Agreement must be enforced. Once enforced, the class action waiver provision precludes Plaintiffs from maintaining their class action certification allegations in this case. Accordingly, Plaintiffs' class action certification allegations must be dismissed and/or stricken pursuant to Rule 12(b)(6), Rule 12(f) and/or Rule 23(c)(1)(A).

**C. The Terms of Service Provided to the Court Apply to Plaintiffs.**

Any argument that RTA Media's Terms of Service Agreement did not apply to claims arising prior to the effective date of the agreement also fails. Prior to April 2025, the Terms of Service Agreements on the Website indicated the agreements were between "Vimeo.com, Inc." and "you, our customer". The Website employs "Vimeo's 'over the top' ("OTT") platform" for displaying video content. Complaint ¶¶ 6-7; ECF No. 20 at 7. In connection with RTA Media's use of the OTT platform, Vimeo provided default templates, including Terms of Service, that purchasers could either leave as-is or modify.

*See* March 2025 email from Vimeo to RTA Media attached hereto as "Exhibit C". Unless modified, these default templates listed Vimeo.com Inc. as "we", "us", or "our", in the Terms of Service, Privacy Policy, and Cookie Policy. *Id.* RTA Media did not modify the default templates to indicate the Terms of Service were "between you and RTA Media Holdings, LLC" until April 2025. Smith Decl., Ex. A., Exhibit B.

That said, Section 10 of the April 2025, Terms of Service makes it clear the Terms of Service apply to any dispute arising before the agreement, and any party with disputes with RTA Media prior to that date would be subject to the terms contained therein, including a waiver of class action rights. Smith Decl., Ex. A. § 10. RTA Media submitted the billing history for Wambold, which demonstrates that he purchased a monthly subscription to the Website on April 22, 2025 (Smith Supp. Decl. ¶ 4, Ex. B.), and he subsequently renewed his monthly subscription on May 22, 2025, and June 22, 2025, which was clearly after the Terms of Service from April 2025, were effective. Guptill also purchased a monthly subscription to the Website after the Terms of Service from April 2025, were effective (on September 19, 2025). Moreover, Section 1 of RTA Media's Terms of Service expressly states that users and subscribers agree to any revised version of the agreements by continuing to use the Website. Smith Decl., Ex. A § 1 at 1; ECF No. 17-2 at 8. Both Wambold and Guptill clearly consented to the April 2025, Terms of Service, and the class action waiver provision contained therein precludes them from maintaining their class action certification allegations in connection with claims arising before or after the effective date of the agreement. Additionally, the prior versions of the Terms of Service

published on the Website are nearly identical to the April 2025 Terms of Service and also contain class action waiver provisions. Exhibit B.

To the extent the Court finds the prior Terms of Service material to its analysis, it also is clear that Vimeo intended the content of the default templates, including the Terms of Service, to benefit RTA Media and visitors to the Website. Exhibit C. In a March 2025, email reminding its OTT Platform purchases "about the importance of publishing your own Terms of Service, Privacy Policy, and Cookie Policy for your OTT site" to "help ensure that your policies reflect your specific business practices", Vimeo indicated it would be updating its default templates "[s]tarting April 15 . . . to better reflect the relationship between you and your viewers". *Id*. The email further indicated that unless RTA Media "update[d] the [default Vimeo] terms by the deadline, the updated [default Vimeo] terms will automatically become the agreement between you and your viewers." *Id*.

## VI. CONCLUSION

Based on the foregoing, RTA Media respectfully requests the Court either dismiss or strike Plaintiffs' class action allegations and deny their ability to seek class certification pursuant to Rule 12(b)(6), Rule 12(f) and/or Rule 23(c)(1)(A) of the Federal Rules of Civil Procedure, together with any and all other relief that it deems just and appropriate.

This 19th day of February 2026.

**WILSON ELSER MOSKOWITZ**
**EDELMAN & DICKER, LLP**

*/s/ Spencer H. Hoisington*
Spencer H. Hoisington
N.C. State Bar No. 43481
Chanda L. McClain
N.C. State Bar No. 56537
227 W. Trade St., Ste. 1830
Charlotte, North Carolina 28202
Telephone: (704) 302-1289
Spencer.Hoisington@wilsonelser.com
Chanda.Mcclain@wilsonelser.com
*Attorney for Defendant RTA Media Holdings, LLC d/b/a Racing America*

## CERTIFICATE OF SERVICE

I hereby certify that on this day the foregoing was electronically filed using the Court's electronic filing system which will electronically serve the following counsel of record:

David M. Wilkerson
Wilkerson Justus PLLC
PO Box 54
Asheville, NC 28802
dwilkerson@wilkersonjustus.com

Mark S. Reich
Levi & Korsinsky, LLP
33 Whitehall Street, Floor 17
New York, NY 10004
mreich@zlk.com

In addition, I served the following counsel, who have not yet appeared in this action, via electronic mail on the same day:

Gary S. Ishimoto
Alyssa Tolentino
Levi & Korsinsky, LLP
33 Whitehall Street, Floor 17
New York, NY 10004
gishimoto@zlk.com
atolentino@zlk.com

This the 19th day of February 2026.

*/s/ Spencer H. Hoisington*

Spencer H. Hoisington

## CERTIFICATE OF WORD COUNT

Pursuant to L.R. 7.3(d)(1), the undersigned certifies that the BRIEF IN SUPPORT OF MOTION TO DISMISS CLASS ACTION ALLEGATIONS PURSUANT TO FRCP 12(b)(6), 12(f) AND/OR 23(c)(1)(A) complies with the Court's word limit as calculated using the word count feature of the word processing software. Specifically, this Document contains 4842 words. This count includes the body of the memorandum and headings, but does not include the caption, signature lines, or any certificates of counsel.

This 19th day of February 2026.

*<u>/s/ Spencer H. Hoisington</u>*

Spencer H. Hoisington