IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| MICHAEL WAMBOLD on behalf of himself and all others similarly situated, | ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 1:25-CV-96 |
| RTA MEDIA HOLDINGS, LLC D/B/A RACING AMERICA, | ) ) ) | |
| Defendant. | ) | |

## **MEMORANDUM OPINION AND ORDER**

Catherine C. Eagles, Chief District Judge.

On behalf of himself and a putative class, Michael Wambold has sued RTA Media Holdings, LLC, based on RTA's alleged disclosure of personal information obtained when Mr. Wambold and class members accessed video content on RTA's website. RTA moves to dismiss the class action component of the complaint, contending that Mr. Wambold and all putative class members have contractually waived their right to pursue class relief. Doc. 34. The evidence shows that the initial agreement including the class action waiver was not with RTA, and to that extent the motion will be denied. After the agreement was modified to waive class claims against RTA, Mr. Wambold continued to use the website, and he has waived his class claims after that date.

## I.    Procedural History

Mr. Wambold filed suit in February 2025 asserting claims on behalf of himself and all persons who subscribed to RTA's website and watched pre-recorded video content on the website.[1]  He alleges that RTA offers streaming and pay-per-view videos of "short track racing," "NASCAR Cup Team content," and "behind the scenes exclusives."  Doc. 1 at pp. 1–2 ¶¶ 1–2, 4.  Mr. Wambold alleges that RTA configured the website to employ data "tracking tools" to collect information about subscribers' viewing "history" and other "sensitive information," also known as "personally identifiable information" ("PII"), and that data was transmitted to third parties, such as Facebook and Google, without the subscribers' consent or authorization.  *Id.* at pp. 1, 20–21, 23, 25–35, ¶¶ 103, 108–111, 121, 130, 133, 137–47, 152.

Mr. Wambold brings federal claims for violation of the Video Privacy Protection Act and the Federal Wiretap Act, and state law claims based on the Pennsylvania Wiretapping and Electronic Surveillance Control Act, and the tort of intrusion upon seclusion.  *Id.* at pp. 47–56.  He seeks class certification on behalf of all persons who subscribed to RTA's website.  Specifically, he identifies the following proposed classes:

> **Nationwide Class:**  All persons in the United States with a subscription to the Website that had their Sensitive Information improperly disclosed to third parties through the use of the Tracking Tools (the "Class").

> **Pennsylvania Subclass:**  All persons in Pennsylvania with a subscription to the Website that had their PII improperly disclosed to third parties through the use of the Tracking Tools (the "Pennsylvania Subclass").

---

[1] Another individual, Robert Guptill, originally was a plaintiff in addition to Mr. Wambold, but he voluntarily dismissed his claims on July 14, 2026.  Doc. 43.  The Court has amended the caption of the case to reflect his dismissal.  Doc. 50.

*Id.* at p. 44 ¶ 199.

RTA moved to dismiss the class action allegations in June 2025.  Doc. 17.  The Court denied the motion without prejudice in September 2025 and directed the parties to engage in discovery on the class waiver issue.  *See* Doc. 25 at 2–3.  After settlement discussions stalled, *see* Text Order 12/04/2025, the parties suggested "renewed motion and briefing schedule on the class-action waiver issue," Doc. 30 at 1, and the Magistrate Judge adopted that schedule resulting in the present motion.  *See* Text Order 01/16/2026.

Following an initial round of briefing on the present motion, the Court held a status conference to discuss application of *Maldini v. Marriott Int'l, Inc.*, 140 F.4th 123, 134 (4th Cir. 2025) and *Berkeley Cnty. Sch. Dist. v. Hub Int'l Ltd.*, 944 F.3d 225, 234 (4th Cir. 2019), to the class waiver issue presented.  The parties sought and the Court allowed an additional 60 days for any and all discovery on the waiver issue,[2] and for submission of supplemental briefs.  The parties agreed that "if there are disputed questions of fact but no credibility issues, the parties [will] submit the issue on the papers with closing arguments in person."  Revised Minute Entry 04/28/2026.  Supplemental briefs and evidence were filed, Docs. 46, 47, 49, and the Court heard oral argument July 30, 2026.

## II.      Procedure for Resolving Motions to Enforce Class Action Waivers

Courts consistently resolve the import of class waivers "before they certify a class, and usually as the first order of business."  *In re Marriott Int'l, Inc.,* 78 F.4th 677, 686

---

[2] The Court also directed the parties to begin discovery on Mr. Wambold's individual claims. Revised Minute Entry 04/28/2026.

(4th Cir. 2023). Ordinarily, this occurs at the certification stage. *Id*. But the United States Court of Appeals for the Fourth Circuit has recently noted in a slightly different context that "there is no logical reason to distinguish a waiver in the context of an arbitration agreement from a waiver in the context of any other contract." *Maldini,* 140 F.4th at 134 (cleaned up). This suggests that courts may resolve motions related to class-action waivers by separate motion, in a manner similar to the way motions to compel arbitration are resolved. And because arbitration agreements and class action waivers both depend on whether the parties entered into enforceable contracts, this can make sense in the right case.

For motions to compel arbitration, the moving party must come forth with evidence of an agreement to arbitrate, and if it does, the objecting party has to present competing evidence in order to avoid arbitration. *Berkeley,* 944 F.3d at 234. Courts may consider materials outside the complaint in assessing the motion. *Id.* .

Here, RTA based its motion to dismiss on Rules 12(b)(6), 12(f), and 23 of the Federal Rules of Civil Procedure. The facts are largely undisputed. To the extent they are not, the parties have agreed to have the Court resolve any factual issues related to whether the parties entered into a contract containing a class action waiver based on the written record.

The Court will follow the well-established process applied to arbitration motions.[3]

---

[3] For arbitration motions, "[i]f the record reveals a genuine dispute of material fact . . . the court shall proceed summarily and conduct a trial." *Berkeley,* 944 F.3d at 234 (cleaned up). Such "jury trial can be waived," and the parties can "agree to submit the questions on documentary and deposition evidence in lieu of a trial." *Boyles v. Langmore Cap., LLC,* No. 20-

4

### III. Facts

#### A. The Terms of Service Agreements

All purchasers of content and subscribers to the website are required to affirmatively click a dialogue box confirming agreement to a "Terms of Service Agreement" before they can view any desired content. Doc. 35-1 at ¶ 12.[4] The Terms of Service Agreement in effect before April 2025 stated that it was an agreement between the consumer and "Vimeo.com, Inc." or "Vimeo, Inc." Doc. 35-3 at 1, 16, 29. Vimeo is the company that provides a platform for hosting the website's videos, as well as the streaming technology that allows RTA subscribers to digitally access RTA's content. Doc. 1 at ¶ 6; Doc. 27 at ¶ 6. Going forward, the Court will refer to the agreement in effect before April 2025 as the "Vimeo Agreement." *See* Doc. 35-3 at 1, 16, 29. Nowhere in the Vimeo Agreement does RTA's name appear. *See id.*[5] In April 2025, RTA modified the Terms of Service Agreement to state that it is an agreement between the consumer and RTA. Doc. 35-1 at 8. The Court will refer to this agreement as the "RTA Agreement."

---

CV-545, 2020 WL 4719282, at *3 (M.D.N.C. Aug. 13, 2020). It is not clear that there is a right to a jury trial on the question of whether the parties entered into a contract that contains a class action waiver. Here, no party has asked for such, and the parties waived that right, if it exists.

[4] The ECF footer to this document is difficult to read because the defendants re-filed an identical document as it was filed previously as Doc. 17-2, so that one footer is superimposed on the other.

[5] There are three versions of the Vimeo Agreement in the record, each with materially similar terms as to the class action waiver. *See* Doc. 35-3 at 1, 16, 29. The first version of the Vimeo Agreement in the record states it was "Last updated: September 1, 2022" on its first page. *Id.* at 1. The second version also states it was "Last Updated: September 1, 2022" on its first page. *Id.* at 16. The third version does not include a "last updated" designation. *Id.* at 29.

Like the Vimeo Agreement, the RTA agreement contains a class action waiver. Both agreements begin with a notice stating that consumers "waive [the] right to participate in a class action" or waive class action rights in similar terms. *Id*; *see* Doc. 35-3 at 1, 16, 29. The Vimeo Agreement then states:

> EACH PARTY WAIVES ITS RIGHT TO GO TO COURT, TO A TRIAL BY JURY, AND TO PARTICIPATE IN A CLASS ACTION, CLASS ARBITRATION, OR OTHER REPRESENTATIVE PROCEEDING WITH RESPECT TO ANY COVERED PRIVACY CLAIM.

Doc. 35-3 at 13, 26; *see* Doc. 35-3 at 36.[6] The RTA Agreement states, in similar but more detailed terms:

> B. Waiver of Class and Other Non-Individualized Relief: YOU AND PRODUCER AGREE THAT. EXCEPT AS SPECIFIED IN THIS SECTION 10, (A) EACH OF US MAY BRING CLAIMS AGAINST THE OTHER ONLY ON AN INDIVIDUAL BASIS AND NOT ON A CLASS, REPRESENTATIVE, OR COLLECTIVE BASIS, AND THE PARTIES HEREBY WAIVE ALL RIGHTS TO HAVE ANY DISPUTE BE BROUGHT, HEARD, ADMINISTERED, RESOLVED, OR ARBITRATED ON A CLASS, COLLECTIVE, REPRESENTATIVE, OR MASS ACTION BASIS, AND (B) ONLY INDIVIDUAL RELIEF IS AVAILABLE, AND DISPUTES OF MORE THAN ONE CUSTOMER OR USER CANNOT BE ARBITRATED OR CONSOLIDATED WITH THOSE OF ANY OTHER CUSTOMER OR USER.

Doc. 35-1 at 15.

### B. Mr. Wambold's Interactions with the Website

Mr. Wambold first used RTA's website, on an unspecified date, when it was live-streaming an event that his family was attending. Doc. 49-1 at 34–35. Mr. Wambold made one purchase on the website in 2020, several purchases in 2022, and one purchase

---

[6] The third version of the Vimeo Agreement in the record has the same language except "any covered privacy claim" is replaced with "any claim subject to arbitration." Doc. 35-3 at 36.

in 2024 for the "Turkey Derby All Access at Wall."  Doc. 35-2 at 4.[7]  After that, he initiated a monthly subscription on April 22, 2025, which he renewed once on May 22, 2025.  *Id.*  Mr. Wambold does not recall seeing any terms of service or privacy policies on the website, nor does he recall "clicking a button or checking a box to indicate" agreement with either.  Doc. 49-1 at 29.

Additional facts, disputed and undisputed, will be discussed in context as needed.

## IV.  Discussion

RTA contends that the Vimeo Agreement and the RTA Agreement each preclude a class action here.  Mr. Wambold contends that if he assented to any terms of service, that assent was to the Vimeo Agreement, binding only to himself and Vimeo.  Doc. 47 at 7. He also contends that he does not recall checking a box to indicate his assent and that RTA cannot retroactively impose a class waiver through terms allegedly accepted only after this action commenced.  *Id*. at 8.

### A.  Class Action Waivers Are Matters of Contract

Courts generally apply "ordinary state-law principles that govern the formation of contracts" in determining the formation of an agreement to arbitrate, or in this case an agreement to waive class action claims.  *Berkeley*, 944 F.3d at 236 (cleaned up); *see Maldini*, 140 F.4th at 134.  For a class action waiver to apply, as with the case of arbitration, there must be an agreement between the parties.  *See Mystic Retreat Med Spa*

---

[7]  At his deposition in June 2026, Mr. Wambold testified that he used the website "at least once, and that was to watch the Wall Stadium Turkey Derby."  Doc. 49-1 at 38.  He was not sure if he used it to watch anything else or whether his account was still "active."  *Id.*

*& Weight Loss Ctr., PLLC v. Ascentium Cap., LLC,* No. 21-CV-515, 2023 WL 362814, at *5 (M.D.N.C. Jan. 23, 2023) ("A court may order arbitration of a dispute only where it is satisfied that the parties entered into an agreement to arbitrate it."); *Maldini*, 140 F.4th at 134 ("[P]arties may . . . waive class-action litigation by contract.").

Generally, "[f]or a valid contract to be formed, the two parties must 'assent to the same thing in the same sense, and their minds meet as to all terms.'" *Rowland v. Sandy Morris Fin. & Est. Plan.*, 993 F.3d 253, 258–59 (4th Cir. 2021) (quoting *Normile v. Miller*, 313 N.C. 98, 103, 326 S.E.2d 11, 15 (1985)). North Carolina law requires "the court to examine the language of the contract itself for indications of the parties' intent." *State v. Philip Morris USA, Inc.*, 359 N.C. 763, 773, 618 S.E.2d 219, 225 (2005).[8] The parties' intent is determined in light of "the contract as a whole." *Id.*

### B. The RTA Agreement

In April 2025, after this lawsuit was filed, RTA updated the Terms of Agreement for use of the RTA website to provide that the agreement was between the user and RTA. On April 22, 2025, Mr. Wambold used the website again and by that use agreed to the terms of the RTA Agreement. As of that date, the RTA Agreement is a complete, enforceable agreement between the parties. *See* Doc. 35-2 at ¶ 4; Doc. 35-1 pp. 2–3, ¶¶ 7, 9.

The RTA Agreement contains a class action waiver. Parties to a contract may agree to such waivers, and they are generally enforceable. That is the case here. Mr.

---

[8] In the briefing, the parties apply North Carolina law. Doc. 46 at 14; Doc. 47 at 6–7.

Wambold used the website after the RTA Agreement went into effect, and he thus agreed to waive any class action claims arising from RTA's conduct thereafter.[9]

Mr. Wambold suggests that he is not bound by the RTA Agreement because he did not read it and does not recall clicking through any agreement including a class waiver. Doc. 47 at 8. This evidence is insufficient ignore the waiver. RTA's evidence shows that all users of the website must click to assent to the Terms of Service before accessing the videos, and Mr. Wambold does not affirmatively deny that this is so, nor does he deny that he accessed the website. That he did not read the class action waiver does not matter. *Sydnor v. Conseco Fin. Servicing Corp.*, 252 F.3d 302, 306 (4th Cir. 2001) (noting that a consumer's failure to "make themselves aware of [an] arbitration clause" in a contract they signed "is irrelevant").[10]

RTA contends that the RTA Agreement also bars class actions addressed to claims arising before its effective date, asserting that the language in § 10 of the RTA Agreement

---

[9] The RTA Agreement states that it was "Last updated: April 2025." Doc. 35-1 at 8. RTA does not provide evidence stating in more detail what day exactly in April 2025 the RTA Agreement was updated. *See id*. at pp. 2–3, ¶¶ 7, 9; Doc. 35-2 at ¶ 4. But as this motion only concerns Mr. Wambold's waiver of his class action claims, the Court need not resolve that factual issue.

[10] At oral argument, counsel for Mr. Wambold suggested that the Court defer ruling in light of decisions by some courts refusing to enforce post-litigation additions to contracts of adhesion because of the restrictions in Rule 23(d) on communications between defendants and class members and because of other policy concerns. Mr. Wambold directed the Court's attention to 3 Newberg and Rubenstein on Class Actions § 9:7 (6th ed.); *Avery v. TEKsystems, Inc.*, 165 F.4th 1219, 1231 (9th Cir. 2026); and *Greystone Mortg., Inc. v. Equifax Workforce Sols. LLC*, 820 F. Supp. 3d 353, 371–72 (E.D. Pa. 2026). The Court appreciates the concerns raised in the cases cited by Mr. Wambold and in other cases but declines to address this late-raised argument. The Court has given the parties multiple opportunities for discovery and briefing on the issues related to this class action waiver, and Mr. Wambold's suggestion would result in little more than further delay.

9

"makes it clear" that the RTA Agreement applies "to any dispute arising before the agreement." Doc. 46 at 19–20. But nowhere in the class action waiver in § 10.5.B. of the RTA Agreement does RTA use the word "retroactive," and the section does not use any temporal terms such as "before," "prior," or "past," or otherwise contain an explicit application to past disputes. *See* Doc. 35-1 at 15. RTA does not direct the Court's attention to any particular language in § 10 that makes the agreement retroactive to earlier disputes with RTA, and the Court has no obligation to search for that language in the four pages of single-spaced dense text that make up the section. *See* Doc. 35-1 at 12–15; *see Lab'y Corp. of Am. Holdings v. Kearns*, 84 F. Supp. 3d 447, 460 (M.D.N.C. 2015); *Hughes v. B/E Aerospace, Inc.*, No. 12-CV-717, 2014 WL 906220, at \*1 n.1 (M.D.N.C. Mar. 7, 2014) ("A party should not expect a court to do the work that it elected not to do."). And beyond distinguishing a Ninth Circuit case cited by Mr. Wambold,[11] RTA has not provided any law that supports retroactive application of this particular class action waiver, much less a case from either the Fourth Circuit or the North Carolina courts. *See* LR 7.2(a) (requiring litigants to refer to statutes, rules, and authorities in support of their arguments).[12]

---

[11] *See* RTA's supplemental brief, Doc. 46 at 21–22, distinguishing *Al-Safin v. Circuit City Stores, Inc.*, 394 F.3d 1254 (9th Cir. 2005).

[12] Such cases in the arbitration context are not difficult to find. *See, e.g., Levin v. Alms & Assocs., Inc.*, 634 F.3d 260, 267–68 (4th Cir. 2011). But those cases tend to rely at least in part on "the presumption in favor of arbitrability," *id.* at 267, and the Court is unaware of a similar presumption in favor of class action waivers. Indeed, outside of the arbitration context, under North Carolina law, courts generally apply contracts according to their plain terms, without any presumption in favor of waivers. *RL Regi N.C., LLC v. Lighthouse Cove, LLC,* 367 N.C. 425, 428, 762 S.E.2d 188, 190 (2014); *Walton v. City of Raleigh*, 342 N.C. 879, 881, 467 S.E.2d 410, 411 (1996). Moreover, in § 10.2, a venue selection provision, RTA explicitly referenced "any

10

RTA also points to a provision in § 1 of the RTA Agreement that, according to RTA "states that users and subscribers agree to any revised version of the agreements by continuing to use the Website." Doc. 46 at 20; *see* Doc. 35-1 at 8 § 1 (term providing that RTA "may update this agreement by posting a revised version on our website. By continuing to use the Service, you accept any revised Agreement"). But this provision addresses future revision; it says nothing about its application to past disputes. *See* Doc. 35-1 at 8 § 1.

Finally, RTA contends that because the RTA agreement went into effect after Mr. Wambold filed this lawsuit and after he knew that RTA contended there was a class action waiver, Mr. Wambold's post-lawsuit acceptance of the terms of the RTA agreement bars him from avoiding the class action waiver. Doc. 46 at 22. But it again provides no case law or other legal authority to support this argument. This argument simply reframes the retroactivity argument and requires no further discussion.

In sum, Mr. Wambold accepted the terms of the RTA Agreement on April 22, 2025. The RTA Agreement contains a class action waiver for any claims arising between RTA and Mr. Wambold. For any claims arising after that date, Mr. Wambold is precluded from bringing a class action by the terms of the agreement.

---

dispute that arose before this or any prior agreement," and the absence of such language in the class action waiver section tends to indicate it is not retroactive. Doc. 35-1 at 12. Finally, even if that were not the case, such retroactive waivers of existing claims inserted after a class action has been filed but without advising putative class members that the waiver has been added raise significant concerns about fairness. *See* note 10 *supra*.

11

### C. The Vimeo Agreement

The pre-April 2025 Terms of Service agreement with the class action waiver was between Mr. Wambold and Vimeo. There is no evidence of any contract between Mr. Wambold and RTA during this time in which Mr. Wambold waived class action claims against RTA. In the absence of a contractual agreement to waive such claims, such claims are not waived and parties may ordinarily proceed with those claims in court.

RTA contends that it can enforce the terms of the Vimeo Agreement against Mr. Wambold, asserting that "it is immaterial that the Terms of Service presented to Plaintiffs prior to April 2025 listed Vimeo, not RTA Media." Doc. 46 at 18 (cleaned up). But the only cases they cite for this proposition do not support the argument. *Sydnor* stands for the unremarkable proposition that a party is bound by an arbitration clause in a contract even if they did not read it. 252 F.3d at 306. It does not say that a class action waiver in one contract signed by the plaintiff binds the plaintiff as to disputes with some other entity, nor does it say that merely because the plaintiff did not read the class action waiver that the waiver and contract mean something other than what they say. Similarly, *Corbett v. Bonney*, 121 S.E.2d 476, 480–81 (1961), the Virginia case quoted in *Sydnor*, is distinguishable from the present case, because the court there applied the release at issue as written; the court did not insert new terms or parties as RTA seeks to do here.

RTA makes a passing suggestion about estoppel, *see* Doc. 46 at 19, but it does not support that suggestion with any case law or any evidence. The Court has no obligation to undertake that legal research or to scour the record for evidence that might support it. *See Lab'y Corp. of Am. Holdings*, 84 F. Supp. 3d at 460; *Hughes*, 2014 WL 906220, at *1

12

n.1; *see also* LR 7.2(a) (requiring litigants to refer to statutes, rules, and authorities in support of their arguments).  This argument is waived.

In its initial brief, RTA contends that "Vimeo intended the content of . . . the Terms of Service, to benefit RTA Media and visitors to the Website."  Doc. 35 at 19.  Arguably, this is a reference to the third-party beneficiary doctrine.  But RTA does not support these cursory assertions with any case law or with citations to record evidence supporting the elements required to show that status.[13]  And it makes no reference to this argument in its supplemental brief filed after discovery.  As with its conclusory estoppel argument, this argument is deemed abandoned and waived.

### D.  Conclusion

RTA has not shown that the class action waiver provision in either the Vimeo Agreement or the RTA Agreement applies to any claims by Mr. Wambold arising before April 22, 2025, and RTA's motion to dismiss class claims arising before that date will be denied.  But it has shown that Mr. Wambold and RTA entered into an agreement containing a class action waiver on April 22, 2025, and his claims asserted on behalf of putative class members based on RTA's conduct on or after that date will be dismissed without prejudice.

---

[13] "A person seeking to establish third-party-beneficiary status must demonstrate . . . they entered into the contract directly for the third party's benefit."  *Rogers v. Tug Hill Operating, LLC*, 76 F.4th 279, 289 (4th Cir. 2023) (cleaned up).  Under North Carolina law, the third party must show "the contract was executed for the direct, and not incidental, benefit of" the third party. *Jarman v. Twiddy & Co. of Duck, Inc.*, 289 N.C. App. 319, 326, 889 S.E.2d 488, 495 (2023) (cleaned up).

13

It is **ORDERED** that:

1.  The defendant's motion to dismiss the class action allegations, Doc. 34, is **GRANTED** as to any claims arising on or after April 22, 2025, without prejudice as to any putative class members, and is otherwise **DENIED**.

2.  Mr. Wambold's individual claims arising on or after April 22, 2025, may proceed, as may his individual and class claims arising before that date.

3.  The parties should move forward with remaining discovery immediately. The revised joint Rule 26(f) report, Doc. 31, remains pending before the Magistrate Judge; any revisions to that report **SHALL** be filed within seven business days.

This the 5th day of August, 2026.

_____
UNITED STATES DISTRICT JUDGE

14